**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

Scott Robinson

    v.                               Civil No. 10-cv-19-PB

Hillsborough County Department
of Corrections

**<u>REPORT AND RECOMMENDATION</u>**

Scott Robinson has filed a complaint (document no. 1) and six addenda thereto (document nos. 5-10),[1] pursuant to 42 U.S.C. § 1983, alleging violations of his federal constitutional rights and state tort law during his incarceration at the Hillsborough County House of Corrections ("HCHC").  The matter is before me for preliminary review to determine, among other things, whether the complaint states any claim upon which relief might be granted.  <u>See</u> United States District Court District of New Hampshire Local Rule ("LR") 4.3(d)(2); 28 U.S.C. § 1915A(a).

---

[1]I construe the complaint to consist of the initially filed complaint (document no. 1) and the addenda (document nos. 5-10), in the aggregate, for all purposes.

## Standard of Review

Under this Court's local rules, when an incarcerated person commences an action pro se and in forma pauperis, the Magistrate Judge conducts a preliminary review.  LR 4.3(d)(2).  In conducting the preliminary review, the Court construes all of the factual assertions in the pro se pleadings liberally, however inartfully pleaded.  See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam) (following Estelle v. Gamble, 429 U.S. 97, 106 (1976), to construe pro se pleadings liberally in favor of the pro se party).  "The policy behind affording pro se plaintiffs liberal interpretation is that if they present sufficient facts, the court may intuit the correct cause of action, even if it was imperfectly pled."  Ahmed v. Rosenblatt, 118 F.3d 886, 890 (1st Cir. 1997); see also Castro v. United States, 540 U.S. 375, 381 (2003) (courts may construe pro se pleadings to avoid inappropriately stringent rules and unnecessary dismissals).  This review ensures that pro se pleadings are given fair and meaningful consideration.

To determine if a pro se complaint states any claim upon which relief could be granted, the Court must consider whether the complaint, construed liberally, Erickson, 551 U.S. at 94,

"contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, ___ U.S. ___, ___, 129 S. Ct. 1937, 1949 (2009) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Inferences reasonably drawn from the plaintiff's factual allegations must be accepted as true, but the Court is not bound to credit legal conclusions, labels, or naked assertions, "devoid of 'further factual enhancement.'" Id. (citation omitted). Determining if a complaint sufficiently states such a claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 1950 (citation omitted).

<u>Background</u>

<u>Facts Related to Inadequate Medical Care Claim</u>

Robinson is an inmate at the HCHC awaiting an appeal of his conviction. He claims he is a pretrial detainee.[2]

---

[2]If Robinson has been convicted and filed an appeal with the New Hampshire Supreme Court, he would be considered a convicted inmate unless the imposition of his sentence was stayed and he was held pursuant to a bail detention order. If Robinson was convicted at a bench trial and is incarcerated pending a de novo appeal to the Superior Court, he would be a pretrial detainee.

On November 12, 2009, at approximately 10:00 a.m., Robinson
was lifting weights on a weight machine on his unit.  A cable
snapped on the machine Robinson was using, and he was thrown
backward.  Robinson's lower back slammed forcefully into a metal
railing.  Robinson's back immediately began to swell, and he
experienced intense pain across his lower back.  Corrections
Officer ("C.O.") Morales called the nurse and notified HCHC Sgt.
Brooks.  At 10:20 a.m., HCHC Nurse Descar arrived on the unit and
was told that Robinson hit the railing very hard.  Robinson
showed Descar the football-sized lump that had risen on his lower
back and reported that his pain level was 9 on a scale of 1-10.
Descar recommended that Robinson apply ice to his back during the
first twenty-four hours after the injury.  Robinson asked about
having an x-ray and examination, but Descar told him it was not
necessary because he could stand up, which indicated that his
spine was not damaged.  Descar then noticed that Robinson was
favoring one leg when he walked.  Robinson told Descar that since
he had collided with the railing, he was experiencing sharp pain
in his right leg and felt that he couldn't bear weight on that

---

In this case, Robinson's precise incarcerative status is not
determinative of the outcome of preliminary review, and I will
therefore presume, pursuant to his assertion, that he is a
pretrial detainee.

leg without pain.  Descar opined that Robinson had pinched his
sciatic nerve, and told him it would take awhile to work itself
out.  Descar then promised to bring Robinson ibuprofen and ice
and to run the situation by the HCHC doctor.  Descar left and did
not return until 1:00 p.m., at which time she gave Robinson 400mg
of ibuprofen.  Descar said she had forgotten the ice and said she
would get it right away.  Robinson states that he did not get ice
until 2:15 p.m, and then only after filing a grievance.  Robinson
was again provided with ice at about 6:00 p.m.

At 8:45 p.m., the night nurse told Robinson he would get
more ice the following morning, and that he would get 400mg of
ibuprofen twice a day until November 16, 2009.  Robinson was
placed on medical restriction as a result of his injury which
meant that he was given a bottom bunk and not allowed to go out
for recreation time.

On the morning of November 13, 2009, Nurse Descar returned
to the unit and brought Robinson ibuprofen but no ice, explaining
that she forgot to bring him the ice.  Robinson believes that
Nurse Descar denied him ice in retaliation for his filing of a
grievance against her the previous day.  Robinson's pain
continued.  His back was still swollen, his right leg hurt, and

his left buttock was bruised and numb.  At 9:30 p.m., the night
nurse gave Robinson ibuprofen and said that Robinson should have
been given ice that morning, and that since more than twenty-four
hours had passed since he had been injured, ice would no longer
do him any good.

On November 19, 2009, Robinson submitted a "med slip" - a
written request for medical attention - complaining that he was
in a lot of pain and still having problems with his right leg.
Robinson asked HCHC Nurse Morrison if he would be able to see a
doctor.  Nurse Morrison told him he probably would not see a
doctor, as the doctor only sees patients with debilitating
injuries.  Nurse Morrison told Robinson to ride out the injury
and the pain.

The swelling in Robinson's back continued.  On November 17,
2009, Robinson submitted a med slip for more ibuprofen and
complained of ongoing pain in his back and continuing trouble
with his right leg and left buttock.  Nurse Bambi Cummings saw
Robinson and told him that the swelling in his back was his
muscles knotting, and told him that he would have to apply heat
and stretch his back, and that it would take 4-5 weeks to work
itself out.  On November 21, 2009, Robinson, believing that his

back problem was more than a muscle issue, submitted a med slip again requesting an appointment and examination with the doctor and x-rays.  HCHC Nurse Kocsis looked at Robinson's back and said the lump on his back had shrunk to the size of an orange and that she would confer with the doctor.  Later that night, Nurse Kocsis told Robinson that the doctor had raised his ibuprofen dose to 600mg four times per day.  That dosage helped alleviate some of Robinson's lower back pain but did not help his right leg or left buttock problems.  On November 28, 2009, Robinson submitted another med slip requesting a doctor's appointment and x-rays.

On December 3, 2009, Robinson saw Dr. Matthew Masewic, the HCHC physician.  Robinson claims that Dr. Masewic spent only three or four minutes with him, asked some questions, and did a very cursory examination of his lower back.  Dr. Masewic diagnosed Robinson as having a severe muscle strain.  Dr. Masewic told Robinson the issues with his right leg and left buttock were likely the result of a pinched sciatic nerve.  Dr. Masewic told Robinson it could take six months for his strain to heal and prescribed continued ibuprofen and a regimen of back stretches.

On December 8, 2009, Robinson noted that the lump in his back was smaller, but the pain was not decreasing.  Robinson

7

began to notice that the pain increased when there was moisture in the air due to snowy or rainy weather, leading him to believe that the pain was more than just muscle strain.  On December 23, 2009, when Robinson's ibuprofen prescription was due to expire, he submitted a med slip requesting that the prescription be renewed due to his continuing pain.  Robinson again requested a thorough examination and x-rays.  Robinson explained to Nurse Cummings that he was concerned about a bone-related injury because of his increased pain when there is moisture in the air. Nurse Cummings felt that Robinson's symptoms could indicate the presence of arthritis in Robinson's back.

On December 24, 2009, a nurse told Robinson his ibuprofen had not been renewed.  On December 25, 2009, the nurse at med call told Robinson that he had been prescribed 400mg of ibuprofen twice a day for five days.  On December 26, 2009, Robinson submitted a med slip requesting a doctor's appointment and x-rays and stating that his pain had not improved since the week after he was injured.  On December 27, 2009, Robinson's pain increased and he found he was unable to stand for any significant period of time.  Robinson requested increased ibuprofen and x-rays.  On December 29, 2009, Nurse Morrison gave Robinson a chart

illustrating the same stretches he had been instructed to do on December 3, 2009.  Robinson told Nurse Morrison the stretches had not been helping his pain.  On December 30, 2009, Robinson again requested a renewal and increase of his ibuprofen prescription due to continuing pain.  Nurse Cummings told Robinson the order for ibuprofen had expired and that she could only give him a one-time dose of 400mg of ibuprofen.

On the night of December 30, 2009, a nurse told Robinson that he was not on the list to see a doctor, as Dr. Masewic had denied his request for an appointment.  On December 31, 2009, Nurse Cummings told Robinson that he had been placed on the list for an appointment as of December 30, 2009, but that no appointment had been scheduled yet, and that Dr. Masewic is responsible for scheduling appointments.

On January 12, 2010, Robinson submitted a med slip to Nurse Descar requesting help for his pain.  Robinson had had no treatment at all for his pain since the single dose of ibuprofen on December 30, 2010.  Nurse Descar gave Robinson another single dose of 400mg of ibuprofen.  Nurse Cummings also gave Robinson a 400mg dose of ibuprofen on January 15, 2010.

On January 18, 2010, Robinson saw Dr. Masewic.  Robinson explained to the doctor that he was experiencing continuing pain and had been untreated, except for two one-time doses of ibuprofen, since December 30, 2009.  Dr. Masewic examined Robinson's back more thoroughly than he had previously.  Dr. Masewic prescribed a course of steroids (Prednisone), a muscle relaxant (Flexeril), and a pain reliever (Indocin).  Dr. Masewic also ordered x-rays.  Robinson began receiving Flexeril and Indocin on January 19, 2010, and Prednisone on January 20, 2010.

On January 26, 2010, Robinson's Indocin dose was tapered up to the full dose of 50mg which, Robinson reports, greatly reduced his headaches, insomnia, right leg pain, and right buttock issues.  Robinson still had pain in his back, but it was significantly decreased by the medication.  Robinson reports that he did not receive his medication consistently as prescribed, with doses being missed or delayed for court dates and time he spent in the law library.  Further, Robinson reports that medications were allowed to run out prior to prescriptions being refilled, often resulting in a gap in medication of up to several days.

Robinson states that in early February 2010, his Indocin was not refilled in a timely fashion, and he went three days without the medication. When the refill came in, Robinson was restarted on a full dose of Indocin rather than being retapered up to the full dose. As a result, Robinson states he suffered significant side effects from the Indocin, including migraine headaches, blurred vision, disorientation, and a muscle tic in his eyelid. Further, by the second week in February 2010, the Indocin was no longer adequately relieving Robinson's back pain.

On February 9, 2010, Robinson submitted a med slip to Nurse Descar asking that he be placed on a new medication instead of Indocin because that medication was not effectively treating his pain and he was experiencing adverse side effects. Nurse Descar gave Robinson his dose of Indocin and told him that she would schedule an appointment for him to see the doctor for a possible medication change. Nurses at the HCHC are not permitted to change doctors' medication orders. Nurse Cummings told Robinson that discontinuing the Indocin might worsen his pain, and Robinson decided that continuing to take the Indocin while he waited to ask the doctor to change his medication was more tolerable than going without pain medication, despite the side

11

effects.  Robinson continued to submit med slips requesting a medication change over the weeks following his conversation with Nurse Cummings.

On February 11, 2010, Robinson was taken to the Elliot Hospital for x-rays.  On February 25, 2010, Robinson was called to the HCHC Medical Department to meet with Dr. Masewic. Robinson told Dr. Masewic that he was still in severe pain and that he felt the adverse side effects of the Indocin were outweighing its benefits, particularly since the expiration of the Flexeril, as that medication made the side effects of Indocin easier to cope with.  Dr. Masewic told Robinson that his x-ray showed a compressed disk and damage to his lumbar spine.  Dr. Masewic told Robinson there was no surgical fix for the problem and that his condition would likely worsen over time.  Dr. Masewic renewed Robinson's prescriptions for Indocin and Flexeril.

As of March 4, 2010, Robinson states that the medication prescribed was not helping him very much, and he requested more potent pain treatment.  On March 23, 2010, Nurse Cummings told Robinson that the doctor had reviewed his chart and had not changed his medications.

12

Facts Related to Conditions of Confinement Claims

Robinson claims that a week before his November 12, 2009, injury, a report was filed with the HCHC Maintenance Department ("Maintenance") regarding the fraying of the cable that broke while Robinson was lifting weights, and Maintenance failed to address the problem.  Although Robinson knew of the issue, he used the machine because HCHC Sgt. Jordan had looked at the cable less than twenty-four hours before and said that it was fine.  On December 4, 2009, Robinson spoke with Capt. Cusson, the officer in charge of Maintenance.  Capt. Cusson told Robinson that they were going to remove the weight machine and replace it with monkey bars as a result of Robinson's grievance complaining about the failure to properly maintain the weight machine.  Robinson expressed his concern that he would be subjected to retaliation from other inmates who would blame him for the removal of the weight machine.  Capt. Cusson told Robinson he would leave the weight machine on the unit only if Robinson withdrew his grievance.  Robinson told Capt. Cusson that he was primarily concerned with the failure of Maintenance to diligently maintain the machine despite having been notified that the cable was fraying.  Robinson was suspicious that Cusson's intention was to

prevent Robinson from filing a lawsuit against anyone at the HCHC, as no jail official took his grievance regarding the inadequate maintenance of the weight machine seriously until Dr. Masewic had confirmed that Robinson had, in fact, suffered a documentable injury.  Robinson decided not to withdraw his grievance.  On December 8, 2009, Robinson received the response to his grievance, finding that Maintenance had been cleared from responsibility for the faulty equipment because, although a work order to repair the machine had been submitted at least a week prior to the November 12, 2009, incident, Sgt. Jordan had inspected the cable and deemed it usable less than twelve hours before it broke.  Robinson notes that he has seen a drastic improvement in Maintenance's response to work orders since his grievance was filed, particularly work orders regarding the weight machine.

Robinson complains that on December 3, 2009, during lunch, "huge chunks of dead skin and hair blew off of the vent and into [the inmates'] food and drinks."  When Robinson complained, HCHC Corrections Officer Jerome told Robinson that he had personally placed at least ten work orders with Maintenance to have the vent cleaned.

14

<u>Discussion</u>[3]

I.   <u>42 U.S.C. § 1983</u>

Section 1983 creates a cause of action against those who, acting under color of state law, violate federal constitutional or statutory law.  <u>See</u> 42 U.S.C. § 1983[4]; <u>City of Okla. City v. Tuttle</u>, 471 U.S. 808, 829 (1985); <u>Wilson v. Town of Mendon</u>, 294 F.3d 1, 6 (1st Cir. 2002).  In order for a defendant to be held liable under § 1983, his or her conduct must have caused the alleged constitutional or statutory deprivation.  <u>See</u> <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 692 (1978); <u>Soto v. Flores</u>, 103 F.3d 1056, 1061-62 (1st Cir. 1997).  Robinson alleges that

---

[3]The claims as identified herein will be considered to be the claims raised in the complaint for all purposes.  If Robinson disagrees with this identification of his claims, he must properly file either an objection to this Report and Recommendation or a Motion to Amend his complaint.

[4]42 U.S.C. § 1983 provides that:

> Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

his federal constitutional rights have been violated by state actors.  Robinson's action, therefore, arises under § 1983.[5]

II.  <u>Incarcerative Status</u>

As described above, Robinson asserts that he was a pretrial detainee at the HCHC during the time period relevant to this complaint, and I will so presume.  Robinson's claims relating to the conditions of his confinement, therefore, must be analyzed under the Fourteenth Amendment.  <u>See</u> <u>Mosher v. Nelson</u>, 589 F.3d 488, 493 n.3 (1st Cir. 2009) (citing <u>Burrell v. Hampshire County</u>, 307 F.3d 1, 7 (1st Cir. 2002)); <u>see</u> <u>also</u> <u>Lyons v. Powell</u>, 838 F.2d 28, 29 (1st Cir. 1988) (per curiam) (rejecting an Eighth Amendment challenge to pretrial detention).  Detainees have a constitutional right under the Due Process Clause of the Fourteenth Amendment to be free of punishment.  <u>See</u> <u>Surprenant v. Rivas</u>, 424 F.3d 5, 15 (1st Cir. 2005) (citing <u>O'Connor v. Huard</u>, 117 F.3d 12, 15 (1st Cir. 1997)).  "'[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.'" <u>Martinez-Rivera v. Ramos</u>, 498 F.3d 3, 9 (1st Cir. 2007) (quoting <u>Ingraham v. Wright</u>, 430

_____

[5]Robinson also asserts causes of action under state tort law for negligence and medical malpractice.

U.S. 651, 671-72 n.40 (1977)).   However, challenged conditions or restrictions which can be rationally related to some legitimate administrative goal or security concern generally will not be deemed unconstitutional "punishment."   O'Connor, 117 F.3d at 15. Because the Due Process Clause prohibits the infliction of punishment on a person prior to a judgment of conviction, the issue in evaluating claims by a pretrial detainee is ultimately whether the conditions of confinement were reasonably related to a legitimate state interest or were intended instead as punishment for the detainee's charged offense.   See Surprenant, 424 F.3d at 13; Collazo-Leon v. U.S. Bureau of Prisons, 51 F.3d 315, 317 (1st Cir. 1995).   I will conduct my analysis of Robinson's claims applying this standard.

III. Inadequate Medical Care

The Eighth Amendment protects convicted prison inmates from prison officials acting with deliberate indifference to their serious medical needs.   See Farmer v. Brennan, 511 U.S. 825, 831 (1994).   The Fourteenth Amendment, which protects the conditions of confinement for pretrial detainees, is at least as protective of a detainee's right to medical and mental health care as the Eighth Amendment.   See United States v. Ayala Lopez, 327 F. Supp.

17

2d 138, 144 (D.P.R. 2004) (citing, <u>inter alia</u>, <u>Fischer v. Winter</u>, 564 F. Supp. 281, 298 (N.D. Cal. 1983) ("Since sentenced inmates may be held under conditions that are punitive, while pretrial inmates may not be, the courts have said that the due process clause affords greater protection to unsentenced inmates than the Eighth Amendment affords to the convicted.")).

For medical treatment in prison to be so inadequate a to offend the Constitution, it must constitute "deliberate indifference" to a "serious medical need." <u>Mahan v. Plymouth City House of Corr.</u>, 64 F.3d 14, 18 (1st Cir. 1995). "[Deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain" and such indifference to a prisoner's serious injury or illness states a § 1983 claim. <u>Estelle</u>, 429 U.S. at 104-05. The "deliberate indifference" assessment is a two-part test, having both an objective and subjective component. <u>Farmer v. Brennan</u>, 511 U.S. 825, 934 (1994).

First, the "deprivation alleged must be, objectively, sufficiently serious." <u>Burrell v. Hampshire Cty.</u>, 307 F.3d 1, 8 (1st Cir. 2002). Under this prong, a sufficiently serious medical need is one "that has been diagnosed by a physician as

mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Mahan, 64 F.3d at 18 (internal quotations omitted).

To meet the second prong, the inmate "must show that prison officials possessed a sufficiently culpable state of mind, namely one of deliberate indifference to an inmate's health or safety." Burrell, 307 F.3d at 8 (citing Farmer, 511 U.S. at 834). This subjective test requires the inmate to show that the prison official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm" existed and that he or she did in fact draw the inference. See Burrell, 307 F.3d at 18. Once that is shown, the inmate is then required to show that the official intentionally disregarded the risk of serious harm. As explained by the First Circuit, "[w]illful blindness and deliberate indifference are not mere negligence; these concepts are directed at a form of scienter in which the official culpably ignores or turns away from what is otherwise apparent." Alsina-Ortiz v. Laboy, 400 F.3d 77, 82 (1st Cir. 2005). This standard has "been likened to the standard for determining criminal recklessness." Burrell, 307 F.3d at 8 (internal quotations omitted).

19

Where a prison official is unaware of the risk, he or she "cannot be indifferent." Id. "But even if they are aware, they cannot be deliberately indifferent if they responded reasonably to the risk, even if the harm ultimately was not avoided." Id. Deliberate indifference is not demonstrated by an inmate's disagreement with his treatment, by an allegation that better treatment than what was provided is available, or by a difference of opinion among medical professionals regarding diagnosis and treatment. See Feeney v. Corr. Med. Servs., 464 F.3d 158, 162 (1st Cir. 2006) ("When a plaintiff's allegations simply reflect a disagreement on the appropriate course of treatment, such a dispute with an exercise of professional judgment may present a colorable claim of negligence, but it falls short of alleging a constitutional violation" (internal citations omitted)).

Robinson has alleged that he injured his back in an accident at the prison which caused swelling, extreme pain, and damage to the disks in his spine. These allegations suffice to demonstrate a serious medical need for which adequate medical care is required.

Robinson further claims that the HCHC medical staff acted with deliberate indifference in failing to provide adequate care

for his serious injury.  In support of that assertion, Robinson
sets forth a number of complaints regarding the care he received.
First, Robinson claims that he did not receive an adequate
examination from anyone on the medical staff at the time of his
November 12, 2009 injury, or when he saw Dr. Masewic on December
3, 2009.  Robinson claims that on those occasions he was provided
with only brief and cursory examinations which led the HCHC
medical staff to improperly conclude that he had only suffered a
muscle strain.  Robinson claims that his injury was
underestimated by both Dr. Masewic and the HCHC nursing staff.
As a result, he claims that he was therefore insufficiently
treated, was not provided with a thorough exam until January 18,
2010, more than two months after his initial injury and request
for an examination, and waited almost another month until
diagnostic x-rays were taken.

Robinson states, however, that he saw a nurse twenty minutes
after his injury.  That nurse examined his back, albeit in
cursory fashion.  That nurse also provided Robinson with
ibuprofen three hours later and ice an hour after that.  The
nursing staff saw Robinson almost daily, if not daily, during the
week after the accident, and provided him with ibuprofen and ice.

The nursing staff also referred Robinson to the jail physician. The doctor saw Robinson after the injury.  Robinson was displeased with the timing and with the extent of the doctor's examination and disputes the appropriateness of the treatment the doctor prescribed at that time.  Even if Robinson is correct in his assertion that the medical staff at the prison underestimated the severity of his injury or medicated him inappropriately for his injury, those allegations do not assert the kind of "wanton infliction of pain" or intentional failure to treat a known serious condition that is required to make out a claim for deliberate indifference.  At best, Robinson has asserted that the medical staff was negligent or that he was subjected to medical malpractice.

Without any facts to support a showing that any medical professional at the HCHC was actually aware of and disregarded a significant risk to Robinson's health, he cannot assert that the defendants acted with the deliberate indifference necessary to state an Eighth Amendment violation.  Because Robinson fails to allege a constitutional violation, I recommend dismissal of the Eighth Amendment inadequate medical care claim.  If approved,

22

this dismissal would be without prejudice to Robinson raising his claims in a tort action in the state courts.

Next, Robinson claims that he was not given adequate pain medication, and that the medication he was given was sometimes allowed to expire, resulting in periods where he was unmedicated, undermedicated, or improperly medicated.  Robinson's concerns about medication allege a disagreement with the care the HCHC medical staff decided to provide to him.  As such, this claim does not state a viable cause of action against the medical professionals who treated Robinson.  See Feeney, 464 F.3d at 162.

IV.  Retaliation

Robinson alleges that Nurse Descar's failure to bring him ice the morning after he was injured was a retaliatory act for his filing a grievance the previous afternoon.  "[G]overnment actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right."  Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003); see Oropallo v. Parrish, No. 93-1953, 1994 WL 168519, at *3 (D.N.H. May 5, 1994), aff'd, 23 F.3d 394 (1st Cir. 1994) (citing Ferranti v. Moran, 618 F.2d 888, 892 n.4 (1st Cir.

1980) ("[A]ctions otherwise supportable lose their legitimacy if designed to punish or deter an exercise of constitutional freedoms.") (citation omitted)); see Goff v. Burton, 7 F.3d 734, 738 (8th Cir. 1993) (prison officials cannot lawfully impose a disciplinary sanction against a prisoner in retaliation for the prisoner's exercise of his constitutional right).  In order to state a claim for retaliation for exercising his First Amendment rights, Robinson must allege: (1) the conduct which led to the alleged retaliation was protected by the First Amendment, (2) some adverse action at the hands of the prison officials, and (3) a causal link between the exercise of his First Amendment rights and the adverse action take.  See Price v. Wall, 464 F. Supp. 2d 90, 96 (D.R.I. 2006); see also LaFauci v. N.H. Dep't of Corr., No. Civ. 99-597-PB, 2005 WL 419691, at *7 (D.N.H. Feb. 23, 2005) (Unpublished Order).

The First Amendment's protection of the right to petition the government for a redress of grievances includes "access of prisoners to the courts for the purpose of presenting their complaints," Rhodes v. Chapman, 452 U.S. 337, 362 n.9 (1981) (internal citations omitted), as well as redress under established prison grievance procedures.  See Sprouse v. Babcock,

870 F.2d 450, 452 (8th Cir. 1989) (filing of disciplinary charge against inmate, not otherwise actionable, is actionable under § 1983 if filed in retaliation for filing a grievance pursuant to established administrative grievance procedures); Franco v. Kelly, 854 F.2d 584, 589-90 (2d. Cir. 1988) (right to petition "applies with equal force to a person's right to seek redress from all branches of government" and prisoner "should not be any less entitled to relief under section 1983 because he was addressing his complaints to a state administrative agency rather than to a court of law").  As Robinson was exercising a First Amendment right to redress his grievances to the government when he filed his grievance against Descar, and I can find that failure to provide pain relieving treatment to an injured inmate is an adverse act, the determinative issue here is whether Robinson has pleaded facts to show a causal link between his having filed a grievance and Nurse Descar's failure to provide him with ice.

Circumstantial evidence is often enough to support a claim that an adverse action was taken with retaliatory intent, as intentions are often difficult to prove through direct evidence. See Beauchamp v. Murphy, 37 F.3d 700, 711 (1st Cir. 1994);

25

<u>Ferranti</u>, 618 F.2d at 892 (chronology of events provided support for inference of retaliation); <u>McDonald v. Hall</u>, 610 F.2d 16, 18 (1st Cir. 1979) (same); <u>see</u> <u>also</u> <u>Woods v. Smith</u>, 60 F.3d 1161, 1166 (5th Cir. 1995).  Here, Robinson's factual allegations include Nurse Descar's providing only ibuprofen and not ice to him on November 13, 2009, the morning after he filed a grievance against her for delaying the provision of ice to him on November 12, 2009.  It was a different nurse, and not Nurse Descar, who told Robinson on November 12, 2009 that he would receive ice the following morning.  Here, any retaliatory motive that might be inferred from the sequence of events is belied by Descar's providing ibuprofen for his pain and by her own explanation for her oversight, which is not patently unreasonable.

Therefore, Robinson has failed to state facts that give rise to a reasonable inference that Nurse Descar's failure to bring him ice on the morning of November 13, 2009, was retaliatory, and not merely an oversight.  Accordingly, I recommend dismissal of this claim from this action.

V.   <u>Claims Against HCHC Maintenance Department</u>

Robinson claims that Maintenance failed to properly maintain the weight machine at the HCHC resulting in the dangerous

26

breaking of a frayed cable while Robinson was using the machine.
Robinson further alleges that Maintenance failed to adequately
clean a vent, resulting in a gust of unhygienic particles landing
on his food on one occasion.

To the extent that Robinson intended to file a suit under §
1983 claiming that the maintenance of the HCHC facilities was
constitutionally inadequate, he was required to allege that the
challenged conditions were the product of "deliberate
indifference" to his safety on the part of a prison official.
See Consolo v. George, 58 F.3d 791, 793-95 (1st Cir. 1995).
Robinson has alleged that Maintenance was aware for at least a
week or more before it failed that the weight machine required
repair, and for at least a week prior to the gust of particles
complained of that an air vent in the facility required cleaning,
and did not immediately address those issues.  While the lack of
prompt attention to those matters may constitute negligence on
the part of Maintenance, Robinson's allegations are insufficient
to assert a claim that any official at HCHC acted with
"deliberate indifference" to the safety of the inmates, as there
is no indication that officials knew of and failed to address an
actual and imminent risk of serious harm to the inmates.

Further, Robinson states he was aware of the problem with the cable and chose to use the machine anyway, based on one officer's opinion that it was usable.  A weight machine is not an essential component of "the minimal civilized measure of life's necessities" guaranteed to inmates.  See Farmer, 511 U.S. at 834. Robinson's allegation that he was denied a safe weight machine does not allege a deprivation of a basic human need.  I draw the same conclusion about the air vent.  There is no indication in the complaint that the failure to immediately clean the vent, resulting in a single gust of unhygienic particles on Robinson's food, was a deliberately indifferent denial of basic human needs.

To the extent Robinson has alleged a tort based solely on a common law theory of negligence, rather than a constitutional tort, subject matter jurisdiction in this Court would have to be founded on diversity of citizenship and an amount in controversy in excess of $75,000.  See 28 U.S.C. §§  1331 & 1332.  Here, Robinson's allegations support neither a finding of diversity of citizenship between himself and the HCHC defendants, nor a conclusion that the amount in controversy exceeds $75,000.  I find, therefore, that Robinson has failed to state a claim against the HCHC Maintenance Department upon which relief can be

granted in this Court.  Accordingly, I recommend that the claims against the HCHC Maintenance Department be dismissed without prejudice to refiling a tort claim in state court.

VI.   Municipal Liability

Robinson has named the Hillsborough County Department of Corrections ("HCDC") as a defendant to this action. Municipalities and local government entities are "persons" within the meaning of § 1983.  See Monell, 436 U.S. at 690.  Under New Hampshire law, counties, cities, towns, and their agencies, are considered local governmental units.  See N.H. Rev. Stat. Ann. § ("RSA") 507-B:1 (defining "governmental unit" as "any political subdivision within the state including any county, city, town . . ., but [not including] the state or any department or agency thereof.").  In order to maintain a claim against municipal defendants under § 1983, a plaintiff must ground the claim upon an unconstitutional municipal custom or practice, and two requirements must be met.  "First, the custom or practice must be attributable to the municipality, i.e., it must be 'so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice.'"  Miller v.

Kennebec Cnty., 219 F.3d 8, 12 (1st Cir. 2000) (quoting Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir. 1989)).  Second, the custom must have been the cause of and "the moving force" behind the deprivation of constitutional rights.  Wood v. Hancock Cnty. Sheriff's Dep't, 354 F.3d 57, 64 (1st Cir. 2003) (citing Miller, 219 F.3d at 12).

Robinson has not asserted any facts that demonstrate that the HCDC engaged in a custom or policy of allowing or enabling its employees to violate Robinson's right to adequate medical care in the manner described in his complaint.  I find, therefore, that Robinson has not stated any claim against the HCDC, and I recommend that the HCDC be dismissed from this action.  Because Robinson has not asserted any federal claim upon which relief can be granted, this Court should decline to exercise its supplemental jurisdiction over Robinson's state law claims alleging negligence and medical malpractice.

<u>Conclusion</u>

For the foregoing reasons, I find that Robinson has failed to state any claim upon which relief might be granted, and I therefore recommend that this action be dismissed in its entirety.  If approved, the dismissal would be without prejudice to Robinson filing a tort action regarding this matter in the state courts.  Any objections to this report and recommendation must be filed within fourteen (14) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the district court's order.  <u>See Unauth. Practice of Law Comm. v. Gordon</u>, 979 F.2d 11, 13-14 (1st Cir. 1992); <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986).

_____
Landya B. McCafferty
United States Magistrate Judge

Date:   September 13, 2010

cc:  Scott Robinson, pro se

LBM:jba

31